HOLKER AND OTHERS *v.* PARKER.

March 1st.

*Present.....All the Judges except* TODD, *J.*

An attorney at law, as such, has authority to submit the cause to arbitration. But an attorney at law, merely as such, has no right, strictly speaking, to make a compromise for his client.

THIS was an appeal from the Circuit Court for the district of Massachusetts, in a suit in Chancery brought by Holker, and others, his assignees, against Parker, to set aside an award made under a rule of Court in a suit at law in the same Court between Holker and Parker.

The case, as stated by MARSHALL, *Ch. J.* in delivering the opinion of the Court, was as follows:

In the year 1782 John Holker, one of the Plaintiffs, in this cause, Daniel Parker, the Defendant, and William Duer, who is dead insolvent, formed a trading company, under the name and firm of Daniel Parker & Co. of which Daniel Parker was the acting partner. After receiving large sums of money, and contracting debts to a great amount, Parker absconded from the United States without making any settlement of his accounts. In the month of December, 1785, Holker commenced a suit against Parker in the Court of common pleas for the county of Philadelphia, where the said Parker had resided and carried on the business of the co-partnership. This suit was commenced by attaching the effects of Parker in the hands of Thomas Fitzsimmons. In June, 1788, a judgment in favor of the said Holker was rendered on the verdict of a jury for the sum of 47,231*l.* 12*s.* 9*d.* Pennsylvania currency, equal to $125,951 03. The property attached, amounting to $5,000, was sold and paid to the said Holker towards satisfying this judgment.

Other attachments were laid by Holker on the property of Parker, and proceedings were also instituted against him by other persons, creditors of the company. On the 31st of December, 1788, while these were depending, an indenture of six parts was made and executed between said Parker by Andrew Craigie, his attorney, of the first part, John Holker of the second part, Samuel Rogers of the fourth part, by Andrew

Craigie, his attorney, Royal Flint of the fifth part, and sundry creditors of Daniel Parker & Co. of the sixth part. William Duer was named in the said indenture as of the third part, but never executed the deed.

HOLKER
v.
PARKER.

The object of this deed was to convey to Royal Flint in trust for the creditors of Daniel Parker & Co. and for other purposes therein specified, the partnership effects of Geyer, De la Lande, and Fynye, to which Parker represented himself to be entitled, and which he had previously conveyed to the said Samuel Rogers. By this indenture the said Parker covenanted among other things that he would, within eight months from the date thereof, repair to Philadelphia personally, or by attorney, and then settle all the accounts of the company. It was further agreed that the said Parker and Holker should, within eight months from the date of the first indenture, reciprocally give bonds to each other in the penal sum of 50,000*l.* Pennsylvania currency conditioned for the settlement of their respective accounts within ten months thereafter, and for payment of their several balances to Royal Flint and his successors for the trusts in the said indenture mentioned. The bonds to be assigned to the said Royal Flint or his successors in trust as aforesaid.

In consideration of the premises the said Holker, and also the said parties of the sixth part, severally covenanted with the said Parker that they would immediately " vacate, annul, discontinue and withdraw all suits, " actions and proceedings whatever, which they or any " or either of them shall or may at any time or times " heretofore have commenced, brought or prosecuted " against the said Daniel Parker or his estate, goods, " chattles or property in any Court or place whatso- " ever in Europe or America, and shall and will place " him, the said Daniel Parker, and his property in the " same situation as they were before the commencement " of such suits or proceedings." And the said Holker further covenanted not to commence or prosecute any action against him, the said Parker, for any balance that might be due until after eighteen months after the eight months aforesaid should have expired.

The bonds were given, but Parker failed to comply

HOLKER
v.
PARKER.

with the covenant for settling the accounts of the co-partnership transactions.

The effects of Geyer, De la Lande, and Fynye, which were assigned to Royal Flint, being insufficient to satisfy previous charges on them, proved totally unproductive.

Debts to a large amount due from Daniel Parker & Co. were recovered from Holker and paid by him.

On the 21st July, 1796, Holker made a power of attorney to James Lloyd, of Boston, for the purpose of recovering from the said Parker the monies supposed to be due to him, and at the same time transmitted to the said Lloyd copies of the judgment obtained by him against Parker in June, 1788, and of a judgment obtained against Holker by John Ross for the sum of 12,933l. 7s. 1d. Pennsylvania currency, equal to $ 34,488 95. This judgment was for a debt due from Daniel Parker & Co. was rendered subsequent to the indenture of six parts herein before stated, and had been discharged by Holker.

Mr. Lloyd placed these papers in the hands of Mr. Lowell, an attorney at law of Boston, who instituted an action of debt on the judgment obtained by Holker against Parker. This suit was brought by way of attachment. At the June term, 1797, Daniel Parker appeared by his attorney, and filed four several pleas in bar of the action, in all of which the indenture of six parts herein before stated was pleaded as a release of the judgment on which the suit was instituted.

The Plaintiff's attorney prayed oyer of the instrument of which the Defendant had made a *profert* in his pleas, and, in the October term, 1797, not having replied or demurred to the said pleas, entered into a rule of Court, by which the said action and all demands were referred to Nathan Goodale, George Deblois, and Fisher Ames, esquires, with liberty reserved to Holker of disagreeing to the rule thirty days after he should receive notice of it.

Notice of this rule was received by Holker in August, 1798, but he does not appear to have been informed

that any liberty of dissenting from it was reserved to
him. It would seem that he submitted to it with some
repugnance, and under the idea that it was unavoidable.

HOLKER
v.
PARKER.

On the 8th of September, 1798, Holker made an affidavit, which he transmitted to his attorney, stating many reasons why the referees should not immediately proceed to make up their award in the case, and showing that in the settlement of the complex accounts between Parker and himself, much testimony would be required respecting transactions both in Europe and America, and that so much depended on the entries in the books of the bank at Philadelphia, that the settlement ought to take place there. He declared, however, that he would endeavor to be prepared to appear before the arbitrators in the succeeding months of November or December, or sooner if practicable.

In October, 1798, the rule of reference was made absolute. Mr. Holker had assigned this claim to Mr. Lowell, the father of his attorney at law, the administrator of Mr. Russel, so far as would be necessary to satisfy a debt due to Russel's estate. On the 6th of November, 1798, Mr. Lloyd wrote a letter to Mr. Holker informing him that his affidavit had been laid before the Court, in consequence of which his cause had been continued until the succeeding June term. On the 23d of the same month Mr. Lloyd addressed another letter to Mr. Holker, informing him that the " referees would attend to his business whenever it might be convenient for him to appear before them."

Suits had been instituted against Holker in Philadelphia, in which he had been compelled to give bail in large sums. He then resided in Virginia, and was arrested in Baltimore by his bail in April, 1799, and carried to Philadelphia, where he was enabled to obtain other bail on no other condition than the express stipulation of not proceeding to Boston. On the 18th of May he made an affidavit before the mayor of Philadelphia, stating that he was prevented by this detention from proceeding to Boston in order to attend the referees in person as he proposed to do. That he was about petitioning the Supreme Court of Pennsylvania for a special Court, which he had reason to believe he

HOLKER
v.
PARKER.

should obtain in the course of the succeeding July or August, but that in the mean time it was utterly out of his power to go to Boston. This affidavit was transmitted to his attorney in Boston. On the 24th of June Mr. Lowell addressed the following letter to Mr. Holker:

" I received your affidavit through my friend Mr. " Lloyd, and with much difficulty obtained a delay. " The referees adjourned to the first of September next, " when the cause will go on at all events, whether you " are here or not. As to success without your aid it is " out of the question, as we know nothing of the cause, " and as your subsequent covenants with Parker will " appear to annihilate your claims under the judgment. " Whether you will eventually succeed in getting a " nominal judgment against Parker if you do attend, " you alone can judge. I am rather inclined to think I " could persuade the adverse counsel to give us a judg- " ment for the whole or part of the property attached. " ($ 7,200) They appear to be heartily sick of defend- " ing Parker, as they know him to be immersed beyond " hope of recovery, and are doubtful whether they will " be compensated for their trouble. Whether some ar- " rangement of this sort would not be advantageous to " you if it can be effected, considering your doubt of re- " covery, and the certainty of Parker' inability to pay " what may be decreed, you best can judge.

" Whatever you do on this point let it be explicit, as " Mr. Lloyd and myself mean to avoid all responsibili- " ty and every hazard of future blame. I beg you will " inform me speedily what we shall do about your ac- " tion, as the referees will meet in sixty days or there- " abouts."

This letter was transmitted to Mr. Holker by Mr. Lloyd, who subjoined thereto the following letter:

" Immediately on the receipt of your favor covering " a memorial to the Circuit Court, I delivered them " both to Mr. Lowell who duly attended thereto : the " result is communicated in the foregoing letter from " that gentleman. His obtaining the delay is what " could not have been calculated on. The Court would

" not have granted it. To avoid expense in feeing
" counsellors it was acceded to by the other party.

" The period now fixed can no longer be protracted
" on any account whatsoever.  From what I can learn
" of the disposition of the Defendants, it is truly depict-
" ed to you in Mr. Lowell's letter: they would, as he
" observes, probably confess judgment for the greater
" part if not the whole of the property attached.  It
" must be understood that they would do this only on
" the condition that they should receive *a full discharge*
" *from you on account of Daniel Parker.*  You will please
" to let me receive your determination as soon as may
" be convenient."

These letters were never answered by Mr. Holker.
A petition had been presented by 'Holker to the Su-
preme Court of Pennsylvania to have his person libera-
ted on delivering up all his property for the use of his
creditors in pursuance of a law of that state.  This pe-
tition came on to be heard on the 13th of September,
1799, but was continued from time to time until the 14th
day of April, 1800; when by the judgment of that
Court he was discharged from custody.

The referees made the following report to the Circuit
Court during the October term, 1799.

" The subscribers, pursuant to the annexed rule, met
" at the office of Nathan Goodale on the 8th day of
" June, 1799, after notifying John Lowell, jr. esquire,
" attorney for the Plaintiff, John Holker, and William
" Hull, esquire, attorney for said Daniel Parker, the
" said attornies attending our meeting and John Lowell,
" jr. esquire, in behalf of said Holker, having asked a
" delay or adjournment until the first day of September
" then next, now last past, and on the said first day of
" September the referees having again met, and the
" said parties appearing by their attornies, and having
" been fully heard, the said meeting was again adjourn-
" ed at the request of the said Lowell until this day, be-
" ing the 23d day of October, 1799, when the said at-
" tornies having again appeared, and nothing further
" being offered in support of their several allegations
" we do award that the said John Holker, the Plaintiff

HOLKER
v.
ARKER.

"recover against the said Daniel Parker the sum of "$ 5,000 in full satisfaction and discharge of all debts, "costs, judgments, executions, accounts, controversies, "claims or demands, subsisting between them, of what "name or nature soever."

The award was read and accepted, and judgment immediately rendered for $ 5000 without costs, which sum was received by the attorney of Mr. Holker, and the balance after deducting costs and commissions was paid to the administrator of Russel, to whom Holker was indebted and to whom he had made an assignment of his claims against Parker, so far as it should be necessary to satisfy the said debt.

It appears that the evidences in support of Holker's claims, other than the two judgments which have been mentioned, were never in the hands of his counsel, and were consequently never laid before the referees, that the counsel for Holker never controverted the allegation made on the part of Parker, that the judgment obtained by Holker in the Court for the county of Philadelphia, was released by the indenture of six parts, nor ever insisted that it was to be considered as *prima facie* evidence subject to such objections, or to such discounts as Parker might make. The accounts between the parties do not appear to have been examined, nor the judgment of the arbitrators exercised on any part of the case. The award for $ 5000 was made with the consent of Parker's attorney, and without objection on the part of Holker's attorney. That transaction is thus stated by Mr. Lowell "Some time before the trial, the "counsel for Parker did lead this deponent to under-"stand that as they were desirous of closing the affair, "they should not object to our taking judgment for the "amount attached, but the deponent wholly and abso-"lutely did reject the said proposal. He however sta-"ted it to said Holker and begged his instructions "thereon, but said Holker never replied to said letter; "when the referees met and this deponent found they "would proceed to final judgment against *his client for* "*defect of evidence* he, this deponent, stated the former "offer, but the adverse counsel refused to agree to it "but said that they had no objection to our taking judg-"ment if the referees saw fit for $ 5000 instead of

" $ 7200 or thereabouts, the amount attached; though " they declared they had doubts whether on a final li- " quidation there would be so much due. The referees " taking their admission against them awarded that sum. " But it was never agreed by this deponent that such a " sum should be taken in full of the said Holker's de- " mands. It was no compromise, nor was there any se- " cret understanding; but he deemed it his duty to obtain " even this sum rather than an award, which would have " been otherwise made, that the said Parker owed the " said Holker nothing." The attorney for Mr. Parker whose deposition is also in the record states the transaction thus : " After a considerable examina- " tion of the accounts by the arbitrators without com- " ing to a decision, Mr. Lowell agreed that they should " award to Mr. Holker $ 5000 in full of all demands, " provided, I would agree to give security for the pay- " ment of the money to Mr. Holker or to his attorney ; " Mr. Parker being abroad. I agreed to it. We both " agreed to it. It was done : When Mr. Lowell and " myself had agreed, we stated our agreement to the " arbitrators." To another interrogatory the same wit- ness answers : " I did not recommend to the arbitra- " tors any award until the parties had agreed upon a " sum ; myself and Mr. Lowell."

Two of the arbitrators are dead. The deposition of the third has been taken. He says that the award was founded entirely on the admission of Mr. Parker's at- torney.

The correspondence of Mr. Holker with his attornies shewed his confident reliance on the judgments placed in their hands as amounting to *prima facie* evidence, and that his claims considerably exceeded those judgments. The evidence now taken in the cause swells them to a very great amount.

There is evidence that Daniel Parker was at the time much embarrassed in consequence of deep speculation in the national debt of France ; and that he was certain- ly believed by the attorney of Mr. Holker to be insol- vent. This was at that time the general impression. It was afterwards known to be erroneous.

HOLKER
*v.*
PARKER.

Mr. Holker instituted a suit against Mr. Parker in France, where it was determined that he was barred by the judgment rendered against him in the Circuit Court of the United States on the award.

Holker and his trustees have now brought this suit in the Circuit Court of the United States setting in Chancery, praying that the award may be set aside in whole or in part, that the accounts between Holker and Parker may be settled, and that Parker may be decreed to pay the sum which shall appear to be due. Parker has pleaded the award and judgment thereon in bar of these claims and of any account.

On a hearing, the bill of the Plaintiffs was dismissed, and from that decree an appeal was made to this Court.

HARPER, *for the Appellants,* contended that the award ought to be set aside.

1st. Because the rule of reference was entered into without authority.

2d. Because if there was authority, the rule and the award exceeded it.

3d. Because the award was founded on a mistake in law.

4th. Because it was made on an agreement or compromise made collusively, or inadvertently or by mistake, between the Plaintiff's attorney and the agent of the Defendant.

5th. Because, if no such agreement or compromise were made, the award was founded on a belief of one, and therefore void for mistake.

1 & 2. The reference was made without authority. The letter of attorney to Lloyd is "generally to do and perform all that may be necessary in the premises." It cautiously avoids giving a power to refer to arbitration. Lowell so understood it, as appears from his answer to the 11th interrogatory. Lowell, as attorney at law, had no such authority. If he had, it could only

extend to submit that action, *not all demands.* His
authority was limited to the case in which he was em-
ployed, and Lloyd had authority over two causes of ac-
tion only, the judgment in Pennsylvania recovered by
Holker against Parker, and the judgment recovered by
Ross against Holker and which he had paid.

HOLKER<br>v.<br>PARKER,

3. The award was void because it was founded on a
mistake of the law. It is true this mistake does not
appear on the face of the award, but that is an objection
*at law* only, and not in a Court of equity, which may
go into collateral circumstances, and may set aside the
award if the law be mistaken.

The mistake in law was in supposing that the causes of
action on the judgments of Holker v. Parker, and Ross
v. Holker were barred by the indenture of six parts.
Ross's judgment was obtained in 1795 and paid in 1796,
and the indenture of six parts was made in 1788.
Holker's covenant does not extend to *judgments*—it is
only to "vacate, annul, discontinue and withdraw all
" *suits, actions and proceedings,*" clearly alluding to the
attachments which Holker and others had then recently
instituted against him. This covenant is further ex-
plained by the subsequent covenant not to sue Parker
until the expiration of 26 months from that date.
The expression "suits, actions and proceedings" does
not include judgments. And if it did, yet the covenant
of Parker to appear in Philadelphia within eight months
and settle his accounts, was a *condition precedent* to the
covenant on the part of Holker to vacate, and withdraw
the proceedings then pending. This covenant is ex-
pressed to be " *in consideration of the premises,*" which
expression implies a prior performance on the part of
Parker. It was *quid pro quo.* A man is not presumed
to part with his right until he receive the compensation,
unless he expressly stipulates so to do. The pleas do not
state a performance on the part of Parker. 1, *Lord Ray-
mond,* 662, *Thorpe v. Thorpe.*—2, *Burr.* 899, *Collins v.
Gibbs. Cro. El.* 188.—7, *Co.* 9, 10, *Hob.* 106.—1, *Esp. N.
P.* 128.

4. The award was founded on a compromise entered
into between the attorney of Holker and the agent of
Parker, either by collusion, or by imposition of the lat-

HOLKER
*v.*
PARKER.

ter upon the former; and was without any authority from Hölker. It was an award in *form* only, but was in fact a compromise.

*General Hull,* in his deposition, states it to have been a compromise, and that it was stated as such to the arbitrators. Mr. Deblois, the surviving arbitrator, says the award was made upon the Defendant's acknowledgement *alone,* which implies a compromise. And Mr. Lowell admits there was an understanding that Parker's attorney should acknowledge a balance.

This then was a compromise founded on the collusion of the Plaintiff's attorney, contrary to his duty to his client, and expressly contrary to his instructions, which were not to agree to arbitration unless Parker would give security to pay the award. Why did he wave this condition? Why not inform Holker of his right to dissent to the arbitration?

Holker repeatedly informed Lowell and Lloyd, that the covenant was no bar, because Parker had never settled his accounts agreeably thereto. Yet the attorney yielded to the suggestion of the plea. Again, Holker's letters informed him that the judgment against Parker could not be opened; yet he waved that judgment, (although it was at least *prima facie* evidence even if it could be opened,) and admitted before the referees that the claims of Holker could not be supported. But if there were no collusion on the part of Lowell, he was imposed upon by Hull. He was made to believe that Parker was wholly insolvent, and might have believed that the amount of the attached effects was so much saved out of the wreck of his estate.

But if there was neither collusion nor imposition, the compromise was made without authority. Neither Lloyd nor Lowell had power to make it. Holker had forbidden a reference, but he knew nothing of a *compromise.*

And if it were not a compromise, yet the award was made by the arbitrators upon the supposition that there as one; and being founded on a mistake into which they were led by the opposite party, it is void.

If it is not void for these reasons, yet it is void for misbehaviour in the arbitrators in not looking into the case. They had sufficient evidence before them, but confided in the representations of General Hull.

AMORY *and* P. B. KEY, *contra.*

In the articles of co-partnership it is covenanted that all matters in dispute between the partners shall be left to arbitration; so that Holker could not refuse to agree to the rule of Court.

Lowell and Lloyd were to have fifteen per cent. commission upon all monies collected, and were therefore interested to recover as much as possible. The legal right to the debt was assigned to Russel's administrators with full power to collect it; so that Holker was fully represented.

The plea of the indenture was a good bar to the judgment in Pennsylvania. It was a covenant to open all judgments and go into a settlement of accounts. The parties could not have gone into a settlement of accounts without opening that judgment; for the judgment included all Holker's claims up to a certain time. If it be a covenant to release, it is equivalent to a release. The words of the covenant are, " immediately vacate, annul, " discontinue and withdraw, all suits, actions, and pro- " ceedings whatever, which they or any or either of them, " shall or may, at any time or times heretofore have " commenced, brought, or prosecuted against the said " Daniel Parker or his estate, goods, &c. in any Court " or place whatsoever in Europe or America, and shall " and will place him, the said Daniel Parker, and his " property in the same situation as they were before " the commencement of such suits or proceedings." This is not limited to any suits or proceedings then pending, but includes all suits and proceedings which had been at any time before commenced. It included those which had been prosecuted to judgment as well as those then pending.

But a judgment by default in another state is not conclusive. This judgment was by foreign attachment in Pennsylvania. It was a proceeding entirely *ex parte.* It was in itself an imperfect voucher. It was examina-

HOLKER
v.
PARKER.

ble every where—even in Pennsylvania. *N'il debet* was a good plea to an action upon it in that state; and *a fortiori* in another state.. 1 *Dall.* 375, *M'Clenachan v. M'Carthy.*

But the covenant was a good bar to it. The covenants on the part of Parker were not conditions precedent. They could not be so in the nature of things, for the actions, suits and proceedings were to be vacated *immediately*, and Parker was not to account until eight months afterwards. A covenant not to sue may be pleaded as a release. 2 *Bac. Ab.* 93. *Cro. El.* 352.

A mistake of the law in a doubtful point is no ground to set aside an award. *Kyd on Awards.* 2 *Eq. ca. ab.* 92. 9. *Mod.* 63. 2 *Com. Dig.* 146.

*Lloyd's* power authorized a reference. It was to compel payment of all demands against every body, by all lawful ways and means. Whatever Holker could do in the premises, Lloyd could do. He was not confined to a jury trial. Having the general power to collect, he was of course to use all reasonable and usual means.

But Lowell, as attorney at law, had power to refer the case to arbitration; *Kyd on Awards,* 45, 1 *Dall.* 164, and under the circumstances of the case it was a discreet act. He was led by Holker's letter to suppose that he was to submit the case to arbitration if he could get security. He knew it to be impossible to get security, and therefore took the other part of his instructions and submitted to arbitration without security. The probability is that Lowell did give him notice of his right to dissent. Holker's letter of September, 1798, shows that he knew that all demands were submitted. Lowell, believing that the judgment was barred by the indenture, and being desirous to support the action and the attachment. thought that he was doing a benefit to Holker by extending the reference to *all demands.* But Lowell's mistakes of the law, if they be such, or even his mismanagement of the cause, cannot affect Parker. It is a matter entirely between Holker and his attorney.

The reference, then, was a discreet act, and fully authorized. The parties were bound then to produce their claims and their evidence, or to be forever fore-

closed. Holker knew the time. He asked delay, sup-
ported by his affidavit, and obtained it. He knew that
his personal attendance was not necessary—he knew
that Lowell had not evidence to support the case, yet
he neglected to furnish him with evidence, and aban-
doned his rights, if he had any, and cannot resume them
when he pleases.

HOLKER
v.
PARKER.

There was no compromise. Lowell swears express-
ly there was not. After writing the letter of the 24th
of June, 1799, it is not probable that he would have
taken such a responsibility upon himself.

The bill does not charge fraud in the referees—if it
had, they ought to have been made parties. The object
of the bill is to open an account which cannot *now* be
settled with justice.

All the objections now alleged against the award,
were good in a Court of law, and might have been
urged upon the return of the award. Where a man has
lost his legal remedy by his negligence, he shall not
have relief in equity.

*March* 10th....MARSHALL, *Ch. J.* after stating the
facts of the case, delivered the opinion of the Court as
follows:

On the part of the Appellants it is contended that an
attorney at law has no power, without the consent of
his client, to transfer a cause to other judges than those
appointed by the laws, and to place it before a tribunal
distinct from that before which the party himself has
chosen to place it.

In this opinion however the majority of the Court
does not concur. It is believed to be the practice
throughout the union for suits to be referred by consent
of counsel without special authority, and this universal
practice must be founded on a general conviction that
the power of an attorney at law over the cause of his
client extends to such a rule. Were it otherwise, Courts
could not justify the permission which they always
grant, to enter a rule of reference when consented to by
counsel on both sides. In this case, however, the letter

and affidavit of Mr. Holker of the 8th of September, 1798, manifests at least an acquiescence in the rule, which the opposite party had a right to consider as an assent to it.

The same letter and affidavit will meet the still stronger objection which has been made to the reference of matters not involved in the suit actually depending in Court. They certainly impair very much the weight and influence of those arguments which have been urged against so much of the award as respects those demands of Holker which were not in suit.

The Court, however, does not perceive, in the transactions which took place previous to the award itself, any circumstance which could justify a decree to set it aside. The great and real question in the cause is, has the award been made under such circumstances, and is it of such a character, that it ought to bind the Parties?

In examining this question it is natural to enquire whether this be in fact an award, in forming which the judgment of the arbitrators has been exercised, or a compromise wearing the dress of an award.

The evidence upon this point is thought very clear. Nothing can be more explicit than the testimony of general Hull, who was the attorney of Mr. Parker. He states an agreement in the most express terms between himself and Mr. Lowell on the sum for which the award should be given; and the arbitrator, whose deposition has been taken, declares that the award was made solely on the acknowledgment of the Defendant's counsel.

To the deposition of Mr. Lowell himself great respect is due. He denies a compromise; but on examining his testimony the Court is of opinion that his denial goes no further than to the form. of an agreement. The facts he states prove one in substance. Believing himself that Holker's judgment against Parker was released, and that the referees would entirely disregard it: he himself not having insisted on it, or questioned the validity of the pleas in bar; he reminded Parker's attorney in the presence of the referees of his former offer to give $7,200 in satisfaction of all demands,

It was impossible to misunderstand this declaration. It was substantially a proposition to accept an offer which had been formerly rejected. General Hull replied that he would not now give that sum, but would give $5,000. Mr. Lowell did not agree to accept this offer, but he did not reject it. He looked on silently, and saw the referees about to make up an award, not on the testimony of the cause, but on a declaration on the part of the Defendant that he would give $5,000, made in answer to one from himself apparently clinging to a former offer to give $7,200. The referees necessarily construed this silence into consent, and Mr. Lowell was not unwilling that they should put this construction on it. He thought it his duty, he says, to secure even this sum for his client rather than have an award that Parker owed him nothing; which would have been equally obligatory.

This then is substantially a compromise, and not an award. It is difficult to examine this cause, and to feel the clear conviction which was felt by Mr. Lowell that the referees, had the case of Holker been brought as fully before them as it was in the power of his attorney to bring it, and pressed as earnestly on them as its importance deserved, would have awarded that Parker owed him nothing.

Had not the sufficiency of the pleas in bar been impliedly admitted—had the legal operation of the covenant of six parts been seriously contested, it is far from being clear that the referees would have affirmed the sufficiency of these pleas, or have construed the covenant to be a release of the judgment. There is certainly much reason to doubt whether the covenant of Holker, although it may be an independant covenant, amounts to a release of the judgment he had obtained against Parker. The mind of the referees does not appear to have been exercised on, or called to this question. They do not appear to have had a fair opportunity to form an opinion on it. It does not appear that the indenture itself was inspected by them; and the description given of it in the pleas is inaccurate. The pleas describe the covenant as containing the word " judgment," which it does not contain. The covenant is " to vacate, annul, discontinue and withdraw, all

HOLKER
v.
PARKER.

suits, actions and proceedings whatever." The pleas introduce the word " judgment" in their description of the covenant; a word which essentially varies its construction. Had the real case been brought before the referees, and their attention been directed to this circumstance, it cannot be assumed as certain that they would have considered the judgment as vacated, or would have refused to receive it as *prima facie* evidence of a claim to its full amount: open to such objections as Parker might make to it.

Had they even been of a different opinion, they could not have believed it certain that Parker, who had escaped from this country, leaving debts to an immense amount which Holker was compelled to pay, against whom, when only part of those debts were paid, Holker had obtained a judgment for $125,951 04, was not the debtor of Holker to a large amount. With this view of the case, had they understood that Holker was intercepted in his attempt to attend them, and detained by legal process, it ought not to have been supposed that they would have refused to suspend their award until the issue of his application to the Supreme Court of Pennsylvania for the liberation of his person should be known.

To this Court, then, it appears that this award is not the judgment of the arbitrators in the cause, but a compromise, between the attornies, taking the form of an award, and a compromise made at a time when the cause was not so desperate as the attorney supposed it to be. It was a sacrifice of great and important interests at a time when that sacrifice does not appear to have been absolutely necessary. Has the attorney a right to make such a compromise?

Although an attorney at law, merely as such, has, strictly speaking, no right to make a compromise; yet a Court would be disinclined to disturb one which was not so unreasonable in itself as to be exclaimed against by all, and to create an impression that the judgment of the attorney has been imposed on, or not fairly exercised in the case. But where the sacrifice is such as to leave it scarcely possible that, with a full knowledge of every circumstance, such a compromise could be fairly

made, there can be no hesitation in saying that the compromise, being unauthorized and being therefore in itself void, ought not to bind the injured party. Though it may assume the form of an award or of a judgment at law, the injured party, if his own conduct has been perfectly blameless, ought to be relieved against it. This opinion is the more reasonable because it is scarcely possible that, in such a case, the opposite party can be ignorant of the unfair advantage he is gaining. His conduct can seldom fail to be tainted with some disingenuous practice; or, if it has not, he knows that he is accepting a surrender of the rights of another from a man who is not authorized to make it.

The testimony in this cause accounts for the readiness with which Mr. Lowell acceded to the offer of general Hull. He acted under a mistake, and that mistake is fully disclosed in the record. He believed Parker to be irretrievably ruined. He thought him totally and absolutely insolvent. This impression was communicated to the referees. They too were of opinion that to drudge through the trunks of papers arrayed before them for the purpose of ascertaining how much one insolvent owed another, would be a useless waste of time.

Mr. Lowell was apparently of opinion that nothing beyond the attached effects was worth pursuing He believed sincerely that an award of $700,000 would not avail his client more than an award for $7,000, and that he should ill perform his duty if he put the attached effects in any hazard in the vain attempt to get a judgment for a larger sum. He could not therefore venture on any measure which might have produced a release of those effects. They were the sole object of his contemplation and pursuit. Those he knew to be substance, every thing further he thought a shadow. This opinion seems to have influenced his whole conduct, and to have determined him to accede to the compromise offered by Parker's attorney.

It has been said that an award rendered under these circumstances ought not to bind Holker unless his own gross negligence may have deprived him of that equity which would otherwise belong to his case.

HOLKER
*v.*
PARKER.

Let his conduct be examined.

He appears to have been strongly impressed with the importance of his personal attendance on the arbitrators. Indeed it could scarcely be otherwise. Although his judgment against Parker might not be viewed as a nullity, it would certainly be opened, and all the items on which it was founded be liable to exception. His personal explanations would certainly be essential. They would also be essential in encountering the credits which might be claimed by Parker. His personal attendance was impossible.

He appears to have indulged the hope that he might be liberated in time, until the period allowed for appearing before the referees had passed away.

It is true that he ought to have transmitted his papers to his attornies. The evidence now adduced or a considerable part of it, might then have been obtained. That he was led to believe Parker insolvent, would not be a sufficient excuse for neglecting to do so, unless it could be shown that this impression was made by Parker himself, or by his agents. The evidence to this point does not amount to more than light suspicion.

Yet when it is recollected that the Plaintiff was embarrassed and detained by legal process; that he did not possess a clear and distinct knowledge of the testimony which would be required; that some apology for not making an early exertion to obtain that testimony is to be found in the hope he indulged of being enabled by the discharge of his person to attend the referees; that the expectation, that the judgments in the hands of his counsel would be regarded by the referees, ought not to be considered as entirely unfounded ; this Court is of opinion that it would be too rigid an application of the rule which exacts, from those against whom iniquitous judgments have been obtained, evidence of having done all that was practicable at law, to deny relief in this case.

With the single exception of his omitting to furnish the evidence on which his judgment against Parker was obtained, and to furnish copies of other judgments ren-

dered against him as one of the firm of Daniel Parker & Co. as he did in the case of Ross, (of the efficacy of all which if furnished, nothing decisive can be said,) no negligence can be imputed to Holker.   He has not rested under the decision against him, until Parker, confiding in his security, may have lost the means of protecting himself from an unjust demand, but has pursued him diligently in the Courts of France.   Finding this award and the judgment thereon to be an insurmountable bar to the examination of his claim in the Courts of France, he has without loss of time instituted this suit. Nothing appears in the cause to induce an opinion that the claims of the parties may not now be as fairly and as fully examined as they could have been before the referees in 1799.

Upon a full view of the whole cause this Court is of opinion that the Circuit Court erred in dismissing the bill of the Plaintiffs; and that the decree ought to be reversed and annulled, with directions to set aside the award and the judgment rendered in October, 1799, and to direct an account between the Plaintiff, Holker, and the Defendant.

## DECREE.

This cause came on to be heard on the transcript of the record, and was argued by counsel: On consideration whereof this Court is of opinion that the award made in October, 1799, in a suit brought by the Plaintiff, John Holker, against the Defendant, Daniel Parker, in the Circuit Court of the United States for the district of Massachusetts, and referred by a rule of that Court to referees therein named, and the judgment of the said Court rendered thereon, ought not to bar the claim of the Plaintiffs in this cause to an account of all the transactions of the parties, Holker and Parker, with each other as members of the firm of Daniel Parker & Co. and that there is error in the decree of the Circuit Court dismissing the bill of the Plaintiffs.   This Court doth therefore decree and order that the decree of the Circuit Court be reversed nd annulled, and that the cause be remanded to the Circuit Court to be further proceeded in according to law.

HÖLKER
*v.*
PARKER.
——————

·After the opinion was delivered, P. B. Key mention-ed that in the opinion the Court had said that an ac-count ought to be taken, but the decree only directs that the proceedings below should be according to law.

We wish for leave to answer fully before an account be taken, and wish it may be understood that this Court does not mean to prevent a further answer.

MARSHALL, *Ch. J.* That is the meaning of the Court.